UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BENJAMIN HORTON,

                                   Petitioner,

           v.                                                    9:20-CV-1461
                                                                (GTS)

EARL BELL,

                                   Respondent.
_____

APPEARANCES:                                          OF COUNSEL:

BENJAMIN HORTON
16-A-3539
Petitioner, pro se
Clinton Correctional Facility
P.O. Box 2000
Dannemora, NY 12929

HON. LETITIA JAMES                                    PRISCILLA I. STEWARD, ESQ.
Attorney for Respondent                              Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, New York 10005

GLENN T. SUDDABY
Chief United States District Judge

## DECISION and ORDER

## I.      INTRODUCTION

           Petitioner Benjamin Horton seeks federal habeas relief pursuant to 28 U.S.C. § 2254.

Dkt. No. 1, Petition ("Pet.").[1]  Respondent opposes the petition.  Dkt. No. 42, Answer; Dkt.

_____

           [1] For the sake of clarity, citations to parties filings generally refer to the pagination generated by CM/ECF, the Court's electronic filing system.  The exceptions are the State Court Trial transcripts and the State Court Record ("SCR").  The entire trial proceedings, including pretrial motions, trial testimony, and the sentencing and resentencing hearings, begin on page 104 in Dkt. No. 46-3.  They are abbreviated "T." for trial transcript, "S." for sentencing transcript, and "R.S." for resentencing transcript.  The State Court Record is contained in both Dkt. Nos. 43 and 46, and is separately and consecutively paginated.  Any citation to the trial, sentencing or resentencing transcripts will

No. 43, State Court Records; Dkt. No. 46 & 47, Sealed Documents (including respondent's memorandum of law, filed at Dkt. No. 46-4).  Petitioner filed a reply.  Dkt. No. 54, Traverse.  For the reasons which follow, the petition is denied and dismissed in its entirety.

## II.    STATE COURT CRIMINAL PROCEEDINGS

The Court will briefly discuss the underlying state court conviction and procedural history of the direct appeal and collateral challenges thereto; however, for clarity, the facts related to specific claims will be further discussed in the relevant sections.

The victim in this case was a boy, born in 2003.  T. 426-27, 491.  He is autistic and bipolar, as well as being diagnosed with having significant learning disabilities, obsessive compulsive disorder, and persuasive development disorder.  T. 428, 456.[2]

Petitioner is an adult male, born in 1971, and the victim's mother's cousin.  T. 313, 329 429; SCR 135, 137, 146.  The victim's mother testified that she and petitioner did not share any kind of relationship throughout their adult lives until petitioner helped her, her son (the victim), and her daughter relocate to a home in Galway, New York, in Saratoga County,  in 2014.  T. 430-31.

Beginning around Christmas of 2014, petitioner became a permanent fixture in the victim's mother's home, arriving daily just before the victim would arrive home from school, spending the night, and then leaving the next day after the victim would go to school.  T. 329, 431, 443-44.  Petitioner would also take the victim, then 11 years old, to spend every weekend with him in his home – on Stanley Street in Schenectady, New York – while the

refer to the page numbers on the top right hand corner of the transcript.  Any citations to the State Court Record ("SCR") will refer to the Bates Stamp located at the center of the bottom of each page.

[2] Persuasive development disorder means that the victim is easily persuaded by others to do things.  T. 456.

victim allegedly assisted petitioner with property renovations.  T. 431-32, 501.

At trial, the victim's mother and the victim's cousin talked about how petitioner would isolate the victim and provide him with not only his undivided attention, but also various gifts. Petitioner purchased the victim a phone, a four-wheeler, a PlayStation 4, and school clothes. T. 330, 432, 438, 440.  Petitioner would also play sports with the victim and take him out to eat.  T. 330, 432, 438, 440.  Petitioner did all of this while excluding the victim's sister and the victim's cousin, both young females, who also lived in the same home as the victim and his mother.  T. 432-33.  When asked why the girls were never invited to join them, petitioner responded that "it was boys time."  T. 331, 433..

The victim also testified about his relationship with the petitioner during the winter from 2014 through 2015, describing how they would play football, ride four wheelers, and go out to eat.  T. 494.  The victim also shared that, when he would spend the night at the petitioner's house on the weekends, the petitioner would make the victim sleep in the petitioner's bed and "[s]uck [the petitioner's] penis."  T. 494-95.  Further, the victim described how he would lie on his stomach, with the petitioner positioned on the victim's back, and the petitioner would insert his penis into the victim's anus.  T. 495-96.  When the victim indicated this was uncomfortable, the petitioner put lotion on his penis.  T. 496.  The victim also reported that he and the petitioner would touch each other's penises with their hands.  T. 496-97.  The victim stated that he never asked the petitioner to perform any sexual acts with, or to, him.  T. 498.

The victim explained that he did not remember anyone else living in the same house as the petitioner and that, during the weekends when the two of them were there together, they were alone.  T. 502-03.  The petitioner told the victim that if the victim told anyone what they were doing, the petitioner would kill himself, and so the victim kept the abuse a secret.

T. 497.

On May 8, 2015, the victim's mother told the petitioner he was no longer permitted to be in her home because the victim informed her that he and the petitioner "were doing sexual things." T. 445. This made the victim very sad and angry, so much so that he destroyed his room and cried for the petitioner throughout the night. T. 332, 446.

The following day, the victim and his cousin went on a walk. T. 332. The victim disclosed to his cousin that the petitioner "made [the victim] touch him and stuff and he touched [petitioner]." T. 333. When they returned home, the victim's cousin encouraged him to tell his mother the entire story, and the victim did. T. 333, 446-47. Immediately thereafter, the victim's mother brought him to the Schenectady Police Department to report the abuse. T. 299-300, 447.

The victim also underwent a physical examination with a nurse practitioner. T. 512. The nurse practitioner testified that the examination was non-acute because more than 96 hours had passed since the last sexual contact. T. 510, 512-13. While some "bluish discoloration" was noted around the victim's anus, the findings were "abnormal" but also "fairly nonspecific." T. 517-18. The nurse practitioner shared that it was not unusual that she did not find any injuries on the victim because the genital and anal areas heal quickly and are comprised of tissue that is meant to stretch; therefore, tearing would not be expected unless there was significant trauma. T. 518-19. Anal penetration, she concluded, would not necessarily cause such trauma. T. 519.

The victim's mother also testified about cooperating with law enforcement to arrange a controlled call and meeting with the petitioner, both of which were recorded. T. 300-02, 448,

4

471.  The calls were played for the jury.[3]  Petitioner admitted that he made poor decisions as a role model and that, in attempts to please the victim, the petitioner had engaged in sexual acts with the victim at the victim's request.  Petitioner also admitted that he taught the victim how to masturbate by showing him and that he and the victim had touched each other's penises; however, he denied ever having anal sex or recent oral sex with the victim.

On May 21, 2015, the police arrested petitioner and seized his cell phone.  T. 314-15. Law enforcement conducted a forensic download of the telephone's data and extracted messages from it.  T. 339-40, 343-44.  Petitioner used the phone that he bought for the victim to talk to him through an app.  T. 440.  The victim, whose number was 882-3323, was saved under the name "My Boy" in the petitioner's contacts.  T. 350.  Petitioner sent numerous messages to, and received several responses from, the victim multiple times per week between February and May of 2015.  T. 350-67; SCR 659-691.  On May 8, 2015, petitioner received a text from the victim stating "Am very sorry for everything I've done."  T. 363; SR 659.  Petitioner continued to sending messages to the victim declaring his love until May 15, 2015.  T. 363-67.

Finally, a clinical and forensic psychologist testified generally about the patterns of behavior observed by perpetrators and victims of child abuse.  T. 534-91.  He explained how perpetrators groomed their victims and that, especially with familial-like relationships, it was common for victims to hide the occurrence and continuation of the abuse.  T. 485-93, 562-67.  The doctor also explained that children are often good at remembering the principal details – who did what to whom – but were not so skilled at remembering anything else about

---

[3]  The Clerk's Office received a CD containing the sealed documents and two DVDs containing video files comprising the totality of the evidence within the sealed record.  Dkt. No. 47.

the events.  T. 555-56.  The doctor made clear that he had never met, interviewed or examined the victim or any of the relevant reports in this case.  T. 542-43, 578.

Petitioner did not call any witnesses or present any testimony during the trial.

The jury convicted petitioner of two counts of predatory sexual assault against a child, two counts of first degree criminal sexual act, and one count of first degree sexual abuse and endangering the welfare of a child.  T. 727-729.

At the sentencing hearing, petitioner's counsel objected to portions of the pre-sentencing investigation report.  S.3.  Specifically, he argued that petitioner should not be sentenced as a predicate felon.  S. 3.  The trial judge agreed, ordering that any reference to such be stricken from the record and noting that petitioner's last felony conviction was in 1994, well beyond the applicable time limit.  S. 3-4.

The court sentenced petitioner to concurrent prison terms of 25 years to life for the each count of predatory sexual assault; two determinate 20-year terms for the first degree criminal sex act, to run concurrently with the prior terms; a determinate 7-year period of incarceration with post-release supervision, to also run concurrently, for the first degree sexual abuse; and a determinate 1-year period of local incarceration to merge together with the previous counts.  S. 20-21.

The parties later appeared before the court for resentencing, on August 24, 2016, after the prosecutor informed the court that the first degree criminal sex act counts, and the sentences associated therewith, should be dismissed as lesser included offenses.  R.S. 2-3. The convictions and their sentences were vacated and the other terms remained as previously imposed.  R.S. 3.

**III.    CHALLENGES TO THE CRIMINAL CONVICTION**

6

### A.      Direct Appeal

Petitioner filed a counseled brief and appendix in the New York State Appellate Division, Third Department, directly challenging his conviction.  SCR 101-732.  The appeal argued that petitioner was entitled to relief because (1) the verdict was not supported by legally sufficient evidence and was against the weight of the evidence, SCR 114-19; (2) the trial court made evidentiary errors which resulted in an unfair trial, specifically erroneously admitting secret recordings and hearsay statements and submitting lesser included charges to the jury without proper instructions, SCR 124-26; (3) trial counsel was constitutionally ineffective, SCR 127-29, and (4) the sentence was harsh and excessive, SCR 130-31.

Petitioner also filed a pro se supplemental brief.  T. 733-767.  Specifically, he argued that he was entitled to relief because (1) the grand jury proceedings and indictment were defective, SCR 737-43; (2) his statements to law enforcement were involuntarily made, SCR 744-46, 762-63; (3) his conversations with the victim's mother were illegally recorded, SCR 746-47; (4) his counsel was constitutionally ineffective for failing to (a) call an expert witness or properly investigate the case, (b) seek relief when two of the prosecution's witnesses committed perjury, (c) seek relief for juror misconduct, and (d) object to the admission of the controlled calls, SCR 748-752; (5) his conviction was supported by knowingly false testimony from prosecution witnesses, SCR 753-59; and (6) there was juror misconduct, SCR 760-61.

The Third Department unanimously affirmed the judgment of conviction.  *People v. Horton*, 173 A.D.3d 1338, 1342 (3rd Dep't 2019).[4]  With respect to the sufficiency and weight of the evidence, the Third Department concluded that even though the victim was unable to

---

[4] A copy of the Third Department's decision has been included in the State Court Record.  SCR 1017-24.

precisely identify the specific dates when the charged conduct occurred, viewing the evidence in the light most favorable to the prosecution and crediting the victim's testimony, the jury could decide that all elements of the charged conduct were established.  *Id.* at 1340. Further, the Appellate Division held there was no reasons to conclude that the jury's credibility assessments of the witnesses were against the weight of the evidence.  *Id.*

With respect to the recorded conversations between petitioner and the victim's mother, the Third Department found that the

> evidence was admissible as relevant to the non-propensity purpose of establishing the nature of the relationship between [petitioner] and the victim and for establishing the context for the charged conduct . . . . County Court gave an appropriate limiting instruction, which it reiterated in its jury charge, and we accordingly perceive no abuse of discretion in the finding that the probative value of the recorded conversations outweighed their prejudicial effect so as to warrant their admission . . . .
>
> Further, County Court properly allowed the People to elicit testimony about the fact and timing of the victim's revelations for the nonhearsay purpose of explaining the events kicking off the investigative process that led to the charges against [petitioner] . . . . The testimony in question was brief, explained why the victim's mother directed [petitioner] to leave the Saratoga County residence and then contacted law enforcement, and was followed by an appropriate limiting instruction and jury charge[.]

*Horton*, 173 A.D.3d at 1340-41 (internal quotation marks, alterations, and citations omitted).

The Third Department also found that petitioner's claims about the trial court erring when it failed to instruct the jury regarding lesser included offenses were not preserved due to his failure to object to the jury charge after its delivery.  *Horton*, 173 A.D.3d at 1341.  Even had the claim been preserved, "the verdict was not rendered defective by the absence of such an instruction, and [petitioner] obtained the relief to which he was entitled," during his resentencing.  *Id.*

Moreover, the Third Department observed that many of the instances of ineffective assistance of counsel "involve[d] matters outside the record that must be advanced in a . . . 440 motion, including that trial counsel did not properly investigate the case, communicate with [petitioner], or consult or hire an expert witness . . . to refute the testimony offered . . . at trial." *Horton*, 173 A.D.3d at 1341-42.  To the extent that ineffective assistance of counsel claims relied upon the record, the Appellate Division found petitioner's arguments meritless because his legal representation was meaningful.  *Id.* at 1342.

Finally, petitioner's "challenges to the sufficiency and quality of the proof before the grand jury are precluded;" the other pro se claims reliant on the record "have been examined and lack merit;" and petitioner's sentence was neither harsh nor excessive given petitioner's "prior criminal history, the notably exploitative circumstances surrounding the crimes . . . and [petitioner's] complete lack of remorse."  *Horton*, 173 A.D.3d at 1342.

Petitioner filed both a counseled, SCR 1103-1129, and pro se, SCR 1025-1102, application for leave to appeal to the New York Court of Appeals.  The People filed an opposition.  SCR 1130-32.  On August 22, 2019, the Court of Appeals denied petitioner's applications.  *People v. Horton,* 34 N.Y.3d 933 (2019).[5]

### B.    440 Motion

In September of 2020, petitioner filed a pro se motion to vacate his judgment of conviction pursuant to New York Criminal Procedure Law § 440.10 ("440 motion").  SCR 1134-158.  Petitioner argued that he was entitled to relief because (1) the prosecutor committed a *Brady* violation by failing to disclose the intended witnesses, the victim's

---

[5]  A copy of the Court of Appeals's decision is included with the State Court Record.  SCR 1133.

psychiatric records, and an affidavit that was filed in the petitioner's favor, SCR 1143-46; (2) the grand jury and indictment were defective, SCR 1146-47; (3) the prosecutor knowingly presented perjured testimony from the victim and his mother during the trial, SCR 1147-48; (4) the conviction was supported by legally insufficient evidence, SCR 1148-50; (5) the trial court erred allowing the admission of hearsay statements during the recorded conversations between petitioner and the victim's mother, SCR 1150-51; (6) petitioner's counsel was constitutionally ineffective, SCR 1151-53; (7) there was juror misconduct, SCR 1153-54; (8) the trial court erred in submitted the lesser included counts, SCR 1154, and (9) his harsh and excessive sentence was unconstitutional, SCR 1155-56.  The People opposed the motion. SCR 1159-191.  The petitioner filed a reply.  SCR 1192-98.

On April 12, 2021, the Schenectady County Court denied petitioner's 440 motion. SCR 1201-02.  The court held "that all issues raised allege[d] facts which appear on the record or could have been made to appear on the record so that they could have been raised on [petitioner's] direct appeal."  SCR 1201.  Further, even "were the [c]ourt to consider the arguments . . . the [c]ourt would find them without merit."  SCR 1202.  Therefore, the motion must be denied.  *Id.*

Petitioner did not seek leave to appeal the denial of the motion.

## C.    Coram Nobis Petition

In December of 2020, petitioner brought a pro se error coram nobis petition alleging that he was denied effective assistance of appellate counsel.  SCR 1203-15.  The appellate attorney filed an affirmation in response.  SCR 1216-22.  The Third Department denied the motion on March 5, 2021.  SCR 1223.  Petitioner did not seek leave to appeal the denial of his motion.

**IV.     THE PETITION**

Petitioner challenges his 2016 judgment of conviction in Schenectady County, upon a jury verdict, of two counts of predatory sexual assault against a child, first degree sexual abuse, and endangering the welfare of a child.  Pet. at 1-2; *Horton*, 173 A.D.3d at 1338-39.

Petitioner argues that he is entitled to federal habeas relief because (1) his conviction was supported by legally insufficient evidence, Pet. at 4-5, 13; (2) the trial court committed multiple evidentiary errors, specifically allowing the admission of recorded conversations between the victim's mother and petitioner and hearsay statements from the victim during the trial, which denied petitioner a fair trial, *id.* at 5-6; (3) his trial attorney was constitutionally ineffective for failing to (a) anticipate or prepare a defense to the People's expert, (b) properly impeach the victim and his mother with the mother's previously signed affidavit, and (c) object to the trial court's failure to instruct the jury that counts 3 and 4 were lesser included offenses of counts 1 and 2, *id.* at 6-7; (4) his sentence was harsh and excessive, *id.* at 8-9; (5) he was denied a fair trial due to jury misconduct, *id.* at 12; (6) his conviction was based upon false witness testimony, *id.*; and (7) he was illegally sentenced as a second felony offender, *id.* at 13.

**V.      DISCUSSION**

      **A.     Legal Sufficiency**

The constitutional standard for challenges to the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) ("A reviewing court may set aside the jury's

verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."). In making this determination, "pieces of evidence must be viewed not in isolation but in conjunction." *United States v. Brown*, 776 F.2d 397, 403 (2d Cir. 1985) (quoting *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied*, 397 U.S. 1028 (1970)).

Additionally, "the reviewing court must draw all reasonable inferences and resolve all issues of credibility in favor of the verdict." *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir. 1989) (citation omitted); *see also Cavazos*, 565 U.S. at 2 ("[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial."). Therefore, "we must credit every inference that could have been drawn in the government's favor[.]" *United States v. Villegas*, 899 F.2d 1324, 1339 (2d Cir. 1990) (citation omitted); *see also Lane v. Graham*, No. 9:14-CV-01261 (JKS), 2016 WL 154111, at *8 (N.D.N.Y. Jan. 12, 2016) ("Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction.") (citing *Schlup* v. Delo, 513 U.S. 298, 330 (1995)).

In sum, "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that [state court appellate] judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Cavazos*, 565 U.S. at 2. Furthermore, given that a federal habeas claim receives a second level of deference, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court . . . instead . . . the state court decision [must be] 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos*, 565 U.S. at 2).

While "federal courts must look to state law for the substantive elements of the criminal offense . . . the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 566 U.S. at 655 (citations omitted). Juries are given "broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." *Id.* (internal quotation marks and citations omitted).

Petitioner was ultimately found guilty of three different criminal offenses: predatory sexual assault, first degree sexual abuse, and endangering the welfare of a child. Under New York law, a person is guilty of predatory sexual assault against a child if (1) the person is at least 18 years old; (2) the victim is less than 13 years old; and (3) the person committed one of four sex offenses. N.Y. Penal Law § 130.96. The sex offense relevant here finds an individual guilty when he or she (1) is more than 18 years of age; (2) "engages in oral sexual conduct or anal sexual conduct"; and (3) engages in said conduct with a child less than 13 years of age. *Id.* § 130.50. A person is guilty of first degree sexual abuse when sexual contact occurs between a person who is less than 13 years old and another who is at least 21 years old. *Id.* § 130.65. Finally, a person is guilty of reckless endangerment of a child when he "knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old[.]" *Id.* § 260.10.

The evidence presented at trial was more than sufficient to establish petitioner's guilt on all charges. It is undisputed that the victim was 11 years old at the time of the criminal conduct and the petitioner was in his forties. According, the age requirements for both predatory sexual assault and first degree sexual abuse are satisfied.

Further, the victim testified that when he stayed at the petitioner's home in Schenectady County, the petitioner made the victim perform oral sex on petitioner and that petitioner inserted his penis into the victim's anus. The victim described, in detail, the positioning and sensations that he experienced when petitioner had anal sex with him. The victim also testified that he and petitioner would touch each other's penises, which the petitioner admitted during the controlled recordings that were played for the jury during the trial. As the Appellate Division properly recognized, the jury was entitled to credit the victim's testimony and conclude that the People established that petitioner engaged in oral sexual conduct, anal sexual conduct and sexual contact with a child, which produced mental and physical harm to that child, thus establishing petitioner's guilt of all the crimes for which he was convicted. *Horton,* 173 A.D.3d at 1340; *see also Kelsey v. Lewin*, No. 9:21-CV-0348 (MAD/ATB), 2023 WL 9316847, at *11 (N.D.N.Y. Mar. 28, 2023) (citations omitted) ("[U]nder New York law, where the evidence is legally sufficient with respect to a conviction for sexual abuse, it necessarily also was legally sufficient with respect to the conviction of endangering the welfare of a child.").

Further corroborating the victim's story was the context provided by the testimony from the victim's mother and the victim's cousin which established that petitioner acted in a way to ingratiate himself with the family, and the victim specifically, and then isolate the victim by continually doing things alone together. The petitioner would spend time at the victim's home only when the victim was present, and would either spend the night with the victim in his room or take the victim to spend the night at his house on the weekends. As the prosecution's witnesses corroborated, the petitioner would shower the victim with attention and affection, as seen by buying him expensive gifts; taking him out for dinner and ice

14

cream; playing games with him; and sending him messages professing his love and adoration.  This behavior was consistent with the expert's testimony about how child victims are chosen and groomed prior to sexual contact and why those victims do not disclose the abuse, which then leads to a pattern of continued and persistent abuse.

Petitioner strenuously argues that without DNA or other physical evidence or any other eye witnesses to support the criminal allegations, his conviction cannot stand.  Pet. at 4-5; Traverse at 13, 17022, 26, 27, 40, 55, 57-61.  However, petitioner's arguments are meritless and unavailing.

First, there was an eye witness to the alleged criminal conduct, the victim.  Despite petitioner's assertions to the contrary, "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction . . . and that . . . principle has deep roots in our system of justice." *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004) (citing *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979) & *Weiler v. United States*, 323 U.S. 606, 608 (1945)).

Second, "[g]uilt beyond a reasonable doubt may be established entirely by circumstantial evidence[.]" *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (citing *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994)); *see also United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence[.]") (citing *United States v. Mariani*, 725 F.2d 862, 865-66 (2d Cir. 1984)).  Accordingly, the fact that there is not physical or DNA evidence does not mean that the jury will be unable to do its job to assess credibility and render a conviction. Furthermore, the absence of physical findings were also consistent with the testimony of the nurse practitioner, who stated that because the last sexual encounter had happened over a

week ago – during which time the victim had bathed and changed his clothes – she would

not expect to find any physical evidence or bruising.  Such information, which the jury clearly

deemed credible, was also consistent with, and helped bolster, the testimony from the victim

and his mother and cousin.

Finally, to the extent petitioner attempts to challenge the victim's credibility, a habeas

petition is not the appropriate forum to make such a challenge.  *Maldonado v. Scully*, 86 F.3d

32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of the

witnesses are for the jury[.]").  Petitioner points to the victim's cognitive and mental health

challenges to insinuate that the victim should not be believed, as well as an alleged incident

occurring two years' prior whereupon the victim's mother had signed an affidavit that accused

the victim of making false allegations against petitioner.  Traverse at 42-44.  These issues

were all presented to the jury for their consideration.  By the jury's determination that

petitioner was guilty of several different sexual offenses, it is clear that the jury chose to

believe the victim and his mother.  *See Cavazos*, 565 U.S. at 7 ("[A] reviewing court faced

with a record of historical facts that supports conflicting inferences must presume – even if it

does not affirmatively appear in the record – that the trier of fact resolved any such conflicts

in favor of the prosecution and must defer to that resolution.") (quoting *Jackson*, 443 U.S. at

326) (internal quotation marks omitted).

It is well-settled that federal courts cannot disturb those credibility determinations.

*See Love v. Martuscello*, No. 1:17-CV-6244, 2022 WL 2109244, at *8 (W.D.N.Y. June 10,

2022), *lv. appeal dismissed*, 2022 WL 17684817 (2d. Cir. Nov. 28, 2022), *cert. denied*, 143

S. Ct. 2441 (2023) (denying petitioner's argument that the factfinder "should have weighed

the credibility of the witnesses differently and drawn alternate inferences from the proof,"

because "[n]either [courts] on direct appeal nor . . . federal habeas . . . [are] permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity.") (internal quotation marks and citations omitted).  Therefore, petitioner's request for habeas relief on this ground is denied.

**B.    Evidentiary Claims[6]**

Petitioner contends that he was denied a fair trial because the court admitted (1) the recorded conversations between petitioner and the victim's mother and (2) the victim's mother's and cousin's testimony about the victim's reports of abuse.

"[S]tate evidentiary rulings are generally a matter of state law and not subject to habeas review."  *Daniel v. Conway*, 498 F. Supp. 2d 673, 682 (S.D.N.Y. 2007) (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see also Crane v. Kentucky*, 476 U.S. 683, 689 (1986) ("We acknowledge . . . our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts" because "the Constitution [provides] . . . judges who must make [dozens, sometimes hundreds, of decisions concerning the admissibility of evidence] wide latitude[.]").

> In determining whether a state court's alleged evidentiary error deprived a petitioner of a fair trial, federal habeas courts engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under state law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial.

*Taylor v. Connelly*, 18 F. Supp. 3d 242, 257 (E.D.N.Y. 2014) (citing *inter alia Wade v. Mantello*, 333 F.3d 51, 59-60 & n.7 (2d Cir. 2003)).

---

[6]  Respondent argues that petitioner's claims are unexhausted because he never cited them in federal constitutional terms.  Dkt. No. 46-4 at 22-24.  Because the undersigned has determined that they are clearly meritless, the procedural arguments will not be further discussed.

Petitioner first argues that the admission of the recorded conversations between himself and the victim's mother should have been excluded because they included discussions of the victim's allegations of uncharged incidents of abuse against petitioner as well as petitioner's admissions to some of those acts.  The Third Department held that the evidence was admissible "to . . . establish[] the nature of the relationship between [petitioner] and the victim and for establishing the context for the charged conduct."  *Horton*, 173 A.D.3d 1340 (citing *inter alia People v. Leeson*, 12 N.Y.3d 823, 827 (2009) (allowing testimony of uncharged acts where it involved the same victim, the uncharged acts occurred during the same time period as the accused crime, and the acts "provided necessary background information on the nature of the relationship between [the abuser] and the victim and placed the charged conduct in context.") (internal quotation marks and alternations omitted)).

As our sister district court has explained in its decision denying an almost identical habeas corpus claim,

> [w]here there is a proper nonpropensity purpose, the decision whether to admit evidence of [a] . . . prior bad act[] rests upon the trial court's discretionary balancing of probative value and unfair prejudice.  In cases involving allegations of sexual abuse, evidence of uncharged crimes is admissible to complete the victim's narrative, describe the events leading up to the charge crime and explain the relationship between [the abuser] and the victim, as well as to place the events in question in a believable context and explain the victim's delay in reporting the [abuser's] conduct.

*Martinez v. Colvin*, No. 1:17-CV-0757, 2018 WL 7047148, at *15 (S.D.N.Y. Nov. 6, 2018). Thus, evidence of Martinez's prior uncharged instance of sexual abuse while the victim's family was on vacation, in a different state and four months prior to the victim ultimately disclosing the abuse to her half-brother, was "relevant to material issues concerning the predatory sexual assault count . . . namely, to complete the victim's narrative, place the

18

events in a believable context and explain the victim's delay in reporting petitioner's conduct." *Id.* Much like the situation in *Martinez*, the content of the recorded conversations – where petitioner discussed how he showed the victim how to masturbate as well as admitting to sexual conduct that he previously had with the victim – involved incidents that "occurred shortly before the victim revealed [the abuse] . . . resulting in [p]etitioner's arrest [and] . . . complet[ing] the narrative concerning how [p]etitioner's conduct ultimately came to be revealed and reported." *Id.* Accordingly, petitioner has failed to satisfy the first prong of the two-part analysis, that the state court's evidentiary ruling was improper.

The same is true for petitioner's claim that the trial court erred in allowing testimony from the victim's mother and cousin about his disclosure of petitioner's abuse. The Third Department held that the "testimony about the fact and timing of the victim's revelations for the nonhearsay purpose of explaining the events kicking off the investigative process that led to the charges against [petitioner]," were properly allowed. *Horton*, 173 A.D.3d at 1341. The Third Department stressed that "[t]he testimony . . . was brief [and] explained why the victim's mother directed [petitioner] to leave the Saratoga County residence and then contacted law enforcement[.]" *Id.*

The Third Department was correct in its ruling that the testimony from the victim's mother and cousin throughout the thirty-six hour period immediately preceding the victim reporting the criminal conduct to the police "was properly admitted into evidence as background information, completing the narrative of how [petitioner] came to be investigated for sexually abusing the child." *People v. Gross*, 26 N.Y.3d 689, 694-695 (2016); *see also Dorcinvil v. Kopp*, No. 1:20-CV-0600, 2024 WL 69093, at *6 (E.D.N.Y. Jan. 5, 2024) (concluding that the state court did not violate petitioner's constitutional rights by admitting

testimony not for its truth, but to explain actions of an individual during an investigation).  In sum, the  victim's mother's testimony – about prohibiting the petitioner from being at her home – was an essential precursor to explain the victim's strong emotional response immediately thereafter, which then led to the cousin's testimony, which explained why that response occurred after the victim fully disclosed the abuse to her, and ultimately to his mother, resulting in the victim's mother immediately bringing the victim to the police department to file a statement and have a physical exam completed.

Alternatively, even if these trial court decisions could be deemed erroneous, which they are not, neither would have denied petitioner a fair trial because the trial court provided limiting instructions to neutralize any potential prejudice.  Specifically, during the jury charge, the trial court instructed that it

> allowed testimony of conversations between [the victim's mother] and her son[, the victim], as well as conversations between [the victim's cousin] and [the victim], as well as on the recordings [the victim's mother] refers to conversations she had previously had with [the victim].
>
> In this matter, the law permits a person to testify that the witness did something as a result of something that was said.  In that circumstance, it does not matter who uttered the statement or how the speaker gathered the information for the statement or even whether the statement is truthful and accurate.  It matters only that someone uttered words and the witness did something upon hearing those words.  **So, in that instance, you may consider what the witness was told not for the truth of the words itself, but merely because the witness took action as a result of hearing the statement**.

T. 692-93.[7]  "As a matter of law, the jury must be presumed to have followed the trial court's instructions concerning the limited use that it could make of the [identified recordings and witness testimony]." *Taylor*, 18 F. Supp.3d at 258 (citing *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) & *United States v. Whitten*, 610 F.3d 168, 191 (2d Cir. 2010)). Accordingly, petitioner has also failed to satisfy the second prong of the analysis, thus, his claim is denied.

### C.    Trial Court Error Submitting Lesser Included Offenses Without Proper Jury Instructions[8]

Petitioner argues that he was denied a fair trial because the jury was not properly instructed that Counts 3 and 4 were lesser included offenses of Counts 1 and 2.  Essentially, petitioner claims if the jury knew that they could render a guilty verdict on Counts 3 and 4 only, as an alternative to Counts 1 and 2, the jury may have entered a different verdict.

In order for petitioner to be entitled to relief, the undersigned would have to agree that petitioner was also entitled to a lesser included offense jury charge.  However, this Court has consistently, and very recently, explained that such claims are not cognizable on habeas review.

> The Supreme Court has not determined whether due process requires a trial court to charge a jury with a lesser included offense in a non-capital case.  *Beck v. Alabama*, 447 U.S. 625, 638, n.14 (1980) (expressly reserving the question of whether due process requires a state court to charge lesser included offenses in non-capitol cases); *see also, e.g., Smith v. Barkley*, No. 9:99-CV-0257 (GLS), 2004 WL 437470, at *5 (N.D.N.Y. Feb. 18,

---

[7]  The trial court delivered a similar limiting instruction directly after the victim's mother's testimony.  T. 465-66.

[8]  Respondent argues that petitioner's claims are unexhausted because he never cited them in federal constitutional terms.  Dkt. No. 46-4 at 27.  Because the undersigned has determined the claim is meritless, the procedural arguments will not be further discussed.

> 2004).  "[B]ecause no clearly established Supreme Court precedent
> requires a trial court to provide a lesser included jury charge,
> [P]etitioner . . . cannot establish that the Third Department's
> rejection of this claim was either contrary to or an unreasonable
> application of Supreme Court precedent."  *Acevedo v.
> Superintendent*, No. 9:16-CV-0594 (LEK/DEP), 2018 WL 1326080,
> at *7 (N.D.N.Y. Feb. 16, 2018) (citing *Gibson v. Artus*, No.
> 9:04-CV-0820 (LEK), 2008 WL 9434482, at *10 (N.D.N.Y. Mar. 21,
> 2008), aff'd, 407 Fed. App'x 517 (2d Cir. 2010)).  In other words,
> Petitioner's claim that the state court "err[ed] by not including a
> lesser included offense instruction in this, a non-capital, case is not
> legally cognizable" on federal habeas review.  *Ross v. Conway*, No.
> 9:08-CV-0731 (TJM/DEP), 2010 WL 5775092, at *11 (N.D.N.Y.
> Dec. 6, 2010), *report and recommendation adopted*, 2011 WL
> 484199 (N.D.N.Y. Feb. 7, 2011); *see also, e.g., Gibson*, 2008 WL
> 9434482, at *10 (collecting cases).

*Ferguson v. Lilley*, No. 9:21-CV-1122 (MAD), 2023 WL 7220776, at *17 (N.D.N.Y. Nov. 2,

2023).  Accordingly, to the extent that petitioner's claim is that the trial court erred because it

failed to provide him with the correct, lesser included jury charge to which he was entitled,

any such claims are non-cognizable.

To the extent petitioner intend to allege a different error in the jury instructions, to be

successful such a claim must establish "not merely that the instruction is undesirable,

erroneous, or even universally condemned, but that it violated some right which was

guaranteed to the [petitioner] by the Fourteenth Amendment."  *Davis v. Strack*, 270 F.3d 111,

123 (2d Cir. 2001) (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).  In sum, "[t]he

question is not whether the trial court gave a faulty instruction, but rather whether the ailing

instruction itself so infected the entire trial that the resulting conviction violates due process."

*Id.* (internal quotations and citations omitted).

Here, petitioner's due process rights have not been violated.  First, when petitioner

challenged this issue on his direct appeal, the Third Department properly concluded that

petitioner "obtained the relief to which he was entitled when [the] County Court dismissed the counts charging course of sexual conduct against a child in the first degree as lesser included offenses of predatory sexual assault against a child upon which [petitioner] was convicted." *Horton*, 173 A.D.3d at 1341 (citations omitted).

Second, there is no reason to believe that, had the case been properly instructed with the lesser included counts, that the jury would have done anything different.  The charge was legally correct.  The elements of each crime in the first four counts were properly articulated by the trial judge.  *Compare* T. 695-707 *with* N.Y. Crim. Pro. Law §§ 130.50 (Criminal Sexual Act in the First Degree) & 130.96 (Predatory Sexual Assault Against a Child).  It is just that one of the elements of predatory sexual assault against a child is identical to the crime of first degree criminal sexual act because the latter is an element of the former.

Further the outcome of the charge is not misleading.  Had the jury been instructed as petitioner asserts they should have, the jury would have been asked to consider the greatest count first which, for the reasons already discussed in Section V(A), had all of the elements of the crime satisfied.  Accordingly, petitioner would still have been convicted in the same manner and the supposition that the jury would instead choose to convict on the alternate lesser included charge of first degree criminal sexual act lacks merit.

### D.    Juror Misconduct[9]

#### i.    Relevant Facts

Just prior to the first lunch break during trial testimony, the trial judge provided the jurors with an admonition not to talk with anyone or form any opinions about the criminal case

---

[9]  Respondent argues that petitioner's claims are unexhausted because he never cited them in federal constitutional terms.  Dkt. No. 46-4 at 30-31.  Because the undersigned has determined that they are clearly meritless, the procedural arguments will not be further discussed.

they were hearing.  T. 370.  Specifically, the judge instructed the jurors not to talk to anyone at all about the case or the evidence.  T. 370.  Before reconvening for the afternoon session, two jurors separately sent notes to the trial judge requesting an audience to report issues that occurred during the lunch break.  T. 376-78.

The first juror reported that one of the witnesses who testified during the trial approached her and asked what the juror thought of the case.  T. 381-82.  The juror responded that she could not comment about or otherwise discuss the case, and then both women did not address the other any further.  *Id.*  The juror said nothing affected her ability to be fair and impartial or otherwise create a conflict or issue for her to continue with her jury service.  T. 382-83.  Both attorneys and the trial judge all concluded that the contact was minimal, the juror had not been prejudiced by the encounter, and the juror could continue to serve.  T. 384-85.

The second juror reported that he and his mother-in-law walked to a local restaurant together, intending to get lunch, and spoke only about the menu on the way to the location.  T. 385-86.  The mother-in-law is a court employee, and she was called to return back to the court, cutting their lunch short.  T. 386.  The juror reported that the two never discussed the case and, despite their relation, it did not impact his ability to be fair and impartial.  *Id.*

Petitioner's defense attorney took issue with the fact that the juror had not disclosed the familial relation; however, voir dire did not include any questions about whether a relation beyond a spouse or child worked at the courthouse, thus, there was nothing nefarious or disingenuous about the juror not previously mentioning it.  T. 388-89.  The trial judge ultimately concluded that the juror should not be stricken because he did not discuss the

case with his mother-in-law and his mother-in-law was not working on this case and was not present in the courthouse when the juror was selected to serve.  T. 389-90.

### ii.    Merits

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial, by an impartial jury[.]" U.S. Const. Amend. VI.  However "[t]he handling of possible juror partiality or misconduct is entrusted to the sound discretion of the trial court." *Fama v. Comm'r of Corr. Services*, 235 F.3d 804, 813 (2d Cir. 2000); *see also Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (explaining that with either a direct appeal or habeas petition, challenges of juror bias involve a "determination . . . essentially . . . of credibility, and therefore largely one of demeanor," thus, as the Supreme Court has consistently held, "the trial court's resolution of such questions is entitled . . . to special deference."); *see also United States v. Hockridge*, 573 F.3d 752, 756 (2d Cir. 1978), *cert. denied*, 439 U.S. 821 (1978) ("In treating charges of jury misconduct, the trial judge is according broad discretion.") (citing cases).  "The question presented is whether there is fair support in the record for the state court's conclusion that the jurors here would be impartial." *Wheel v. Robinson*, 34 F.3d 60, 65 (2d Cir. 1994) (citing *Patton*, 467 U.S. at 1038).

Here, just as the courts did in *Wheel* and *Hockridge*, both of the jurors became "the subject of careful inquiry [which] resulted in a determination that the impartiality of the jur[or] had not been compromised." *Wheel*, 34 F.3d at 60.  The trial judge and both counsel all agreed that the first juror's interaction with the trial witness was minimal and of little consequence.  With request to the second juror, the trial court concluded that no conversation had ever been had about the case and that the juror had never been asked, and thus had also never been untruthful or disingenuous, with his representations to the trial

25

court during voir dire.  Accordingly, the trial court's conclusions that there was a lack of juror bias or misconduct, which were supported by the record, were entitled to a continuing presumption of correctness.

### E.   False Testimony

#### i.   Facts

During the cross-examination of the victim's mother, she was asked if she knew of a time when her son, the victim, was untruthful.  T. 460.  Specifically, her attention was drawn to the year 2013, and the victim's mother was asked if she ever signed an affidavit indicating that the victim made untrue statements about the petitioner.  T. 460-61.  The victim's mother responded that she "signed a paper from [petitioner's] lawyer [at the time], but [that she] did not read the paper," because the attorney had allegedly explained the contents of the affidavit to her and only provided her with the last page of the document.  T. 460-61, 463. She was not asked what her understanding of the content of the affidavit was, based upon what she was told by the petitioner's attorney.

The victim's mother clarified that she never saw the first two pages of the affidavit at the time she signed it.  T. 463.  She was not asked to read the affidavit or confirm whether she agreed with its contents while she was testifying during the trial.  The affidavit had her son's name misspelled in it.  T. 463-64.

The affidavit in question was submitted by both parties.  SCR 992-94; Dkt. No. 54-1 at 7-9.  It states that neither the victim nor the victim's mother wish to pursue prosecution of petitioner for alleged instances of sexual abuse, and that the abuse had not actually occurred and, instead, a third party had pressured the victim into falsely reporting those accusations. SCR 992-94; Dkt. No. 54-1 at 7-9.

### ii.    Analysis

Petitioner contends that "[t]he witnesses repeatedly committed perjury when asked about [the] sworn legal affidavit, and about being untruthful . . . and making and filing false statement and crimes to [the] police and court[.]"  Pet. at 12; *see also* Traverse at 42-44 (arguing that the victim's mother was wrongfully allowed to testify about alleged abuse when, several years earlier, she signed an affidavit indicating that her son had wrongfully accused him of abuse that never actually occurred).  Liberally construing petitioner's claims, it appears that he is asserting that his due process rights were violated by the prosecution knowingly presenting false testimony.  This claim was rejected, on the merits, during the Third Department's review of petitioner's direct appeal.  *Horton*, 173 A.D.3d at 1342.

The Supreme Court has long held that convictions obtained by the knowing presentation of perjured testimony is a violation of the Fourteenth Amendment.  *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).  In order to establish perjured testimony, one must "show[] that the witness gave false testimony concerning a material manner with the wilful intent to provide false testimony," which is a separate and distinct situation from where a witness provides "incorrect testimony resulting from confusion, mistake, or faulty memory."  *Black v. Rock*, 103 F. Supp. 3d 305, 317 (E.D.N.Y. 2015).  Once perjury is established, a "conviction must be set aside if (1) the prosecution knew, or should have known, of the perjury, and (2) there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (internal quotation marks and citations omitted).

Here, petitioner has not demonstrated that the victim's mother willfully lied about her son's character.  What the testimony shows is that the victim's mother signed the signature

page of the 2013 affidavit; however, she did not actually know what she was signing because she claims never to have read its contents.  Instead, she relied on the representations from the counsel, who represented petitioner at that time, as to what was in the document.  There was never any further discussion, from either side, about what the victim's mother remembers being told about the content of the affidavit.  However, the inference is that the content of the affidavit is inconsistent with what the victim's mother would have said about her son.

That inconsistency was presented to the jury through the trial testimony and cross-examination of the victim's mother.  The jury heard two different stories – that the victim's mother was duped by a nefarious attorney doing whatever was necessary to prevent petitioner's liability and that the victim's mother was a bold-faced liar who was aware of her son's propensity to lie, specifically about actions involving the petitioner – and was asked to decide what version they believed.  Petitioner's current claim appears to be another attack on the credibility of the victim and his mother and challenge the weight to be accorded to their testimony.  However, as has already been discussed, that decision is not within the purview of the federal habeas court as it has no power to revisit credibility determinations made by the jury.  *Cavazos*, 565 U.S. at 7*; Maldonado*, 86 F.3d at 35.  Accordingly, petitioner's claim is denied.

### F.      Ineffective Assistance of Counsel[10]

---

[10]  Respondent argues that petitioner's claims are partially unexhausted because he never provided the state courts with a full opportunity to adjudicate his constitutional claims. Dkt. No. 46-4 at 35-36.  Further, respondent opposes any attempt to stay the instant action to allow petitioner the opportunity to fully and finally exhaust these claims.  *Id.* at 36.  Because the undersigned has determined that petitioner's ineffective assistance of counsel claims are clearly meritless, the procedural arguments will not be further discussed.

Petitioner asserts three grounds for ineffective assistance of counsel: (1) counsel failed to anticipate or prepare a proper defense to the prosecution's expert witness; (2) counsel failed to properly impeach the victim and the victim's mother about the 2013 affidavit; and (3) counsel failed to object that Counts 3 and 4 should have been charged as lesser included offenses.

To establish that counsel was constitutionally ineffective, a petitioner must demonstrate (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to prove deficiency, "a person . . . must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688). Under the second prong, "a [petitioner] must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. An ineffective assistance of counsel claim must be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (explaining courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. When evaluating an ineffective assistance claim on habeas review, "the question is not whether a

29

federal court believes the state court's determination under the *Strickland* standard was

incorrect[,] but whether that determination was unreasonable – a substantially higher

threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro*, 550 U.S. at

473) (internal quotations omitted).  Therefore, "[w]hen § 2254(d) applies, the question is not

whether counsel's actions were reasonable. The question is whether there is any reasonable

argument that counsel satisfied *Strickland's* deferential standard."  *Harrington*, 562 U.S. at

105.

> Here, the Third Department concluded

> that [petitioner's trial] counsel handled a difficult case capably,
> engaging in successful pretrial motion practice to suppress
> defendant's statements to investigators, then advancing a trial
> strategy of attacking the credibility of the People's witnesses
> through effective cross-examination and appropriate objections. As
> such, "the evidence, the law, and the circumstances . . . , viewed in
> totality and as of the time of the representation, reveal that the
> attorney provided meaningful representation" as required[.]

*Horton*, 173 A.D.3d at 1342 (citations omitted).  That finding is entitled to deference and

petitioner's contentions are, again, denied.

### i.    Failure to Call an Expert

The Supreme Court "ha[s] often explained that strategic decisions – including whether

to hire an expert – are entitled to a strong presumption of reasonableness . . . [because

d]efense lawyers have limited time and resources, and so much to choose from among

countless strategic options." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (internal quotation

marks and citations omitted).  This decision is further complicated by "the risk of harming the

defense by undermining credibility with the jury or distracting from more important issues."

*Id.* (internal quotation marks, alterations and citations omitted).

Here, petitioner has failed to rebut the strong presumption that his counsel's actions in failing to hire an expert are a strategic decision entitled to deference. First, the prosecution's expert's testimony was not overtly damaging to petitioner's case. The testimony encompassed a general explanation about behavioral patterns of the abuser and child victim in sexual assault cases; however, he offered no opinion about the specifics of the victim's experience or the petitioner's actions or culpability.

Second, petitioner's counsel did an excellent job of questioning the doctor. He stressed that the expert had never met, interviewed, or examined the victim and had not reviewed any documents about the case. Further, counsel pressed the expert to quantify a percentage of cases, in which he had personally been involved, that resulted in intentionally and maliciously reported, yet unfounded, allegations of abuse. T. 582-83, 588-89. Even though that figure was extremely small – unfounded allegations in less than 5% of cases – it was still an acknowledgment that, consistent with petitioner's defense strategy, children can lie when alleging abuse. *See Spicola v. Unger*, 703 Fed. App'x 51, 53 (2d Cir. 2017) (explaining that there is no "requirement that defense attorneys in child sex abuse cases . . . must always consult with or call a [child sexual abuse accommodation syndrome] expert in rebuttal," but instead can provide effective counsel through effective cross examination).

Third, it is unclear what kind of expert petitioner anticipates his counsel could have retained or what that expert would have said which would have been beneficial to his cause. "Petitioner's speculation as to . . . how an expert witness may have testified [is] wholly insufficient to satisfy *Strickland*." *Santana v. Bell*, No. 9:20-CV-1098 (TJM/ML), 2023 WL 6737931, at *18 (N.D.N.Y. Aug. 14, 2023) (citing cases). In order to succeed in a claim for failing to call an expert witness, petitioner must "present[] this court with . . . proof that a

witness, who would have qualified as an expert, was available and willing to testify regarding [behavioral patterns of the abuser and child victim in sexual assault cases]." *Kelsey*, 2023 WL 9316847, at *18 (citations omitted).

In sum, "second-guessing trial counsel's decision about retaining an expert witness is exactly the type of strategic choice about which courts reviewing habeas petitioner have been cautioned." *King v. Griffin*, No. 9:17-CV-0321(MAD), 2018 WL 1940419, at *12 (N.D.N.Y. Apr. 23, 2018) (citing *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005)).  Accordingly, the undersigned concludes that the state court reasonably applied the *Strickland* standard.

### ii.     Allegedly Perjured Testimony and the 2013 Affidavit

Petitioner next argues that the affidavit which the victim's mother signed in 2013, which stated that the victim's mother knew that her son, the victim, had made untruthful representations about instances of sexual abuse by the petitioner, should have been used by his counsel to impeach the trial testimony of both the victim and his mother.

First, petitioner could not use the victim's mother's statement to impeach the victim, as the affidavit represented a prior inconsistent statement of the mother and not the victim.  *See Humphrey v. Fisher*, No. 9:07-CV-1200 (TJM/DRH), 2010 WL 7417094, at *10 (N.D.N.Y. July 23, 2010) (explaining New York's evidentiary rules allow "a prior inconsistent statement [to] be introduced to impeach testimony a witness gave on direct examination.").

Second, there is the risk that petitioner's counsel's focus on the affidavit would have significantly harmed the petitioner's defense by undermining his credibility and distracting the jurors, *Dunn*, 594 U.S. at 739, so counsel made a tactical decision not to further pursue the document's questioning.  Specifically, the affidavit alleges that petitioner was sexually abusing the victim two years before the date of the events upon which petitioner's present

criminal conviction are based.  Further conversation about the affidavit and the issues therein would have continued to place the accusation of petitioner being a years-long abuser of the victim before the jury, and petitioner's counsel may have made a tactical choice to limit that dialogue to preserve the petitioner's credibility and likeability for the jury.

Finally, petitioner's arguments that his counsel failed to use the affidavit to impeach the victim's mother are plainly belied by the record.  Counsel did, in fact, cross-examine the petitioner's mother about her signature on the affidavit and the circumstances surrounding it. Again, it appears that counsel ceased his cross-examination of the mother's testimony when she indicated that petitioner's attorney, at the time, had allegedly informed her of the contents of the affidavit yet had her sign only the signature page without reviewing and verifying the accuracy of the assertions in the affidavit.  Given that these are additional character assassinations for the petitioner if the victim's mother is believed, it makes sense that counsel made the tactical decision to cease his questioning of the witness.

Therefore, the undersigned again concludes that the state court reasonably applied the *Strickland* standard.

### iii.    Failure to Object to the Submission of Lesser Included Counts

Petitioner's assertions are correct that counsel failed to realize that Counts 3 and 4 were lesser included offenses for Counts 1 and 2; however, even if those actions are sufficient to satisfy the first prong of the *Strickland* test, petitioner has failed to demonstrate the second.  Petitioner did not suffer any prejudice from the attorney's error because the trial court ultimately dismissed the counts prior to petitioner's direct appeal.  Moreover, even had the objection successfully been made and the jury charge modified to have Counts 3 and 4

serve as alternative counts, given the elements of the crimes within the charges and the legal sufficiency of the evidence, the outcome of the conviction would not have changed.

### G.    Sentence

Petitioner argues that his sentence is unconstitutional for several reasons.  Pet. at 8-9, 13.  First, petitioner contends that he was illegally sentences as a second felony offender.  *Id.* at 13.  Regardless of whether the argument has been properly exhausted, it is plainly meritless as it is explicitly belied by the record.  During petitioner's sentencing hearing, the trial court ordered that any language that petitioner be sentenced as a predicate felon be stricken from the record because it was incorrect and inaccurate as petitioner's last felony conviction was in 1994 "placing it well beyond the category or requirements for a predicate felony offender or second felony offender."  S. 4.  Therefore, petitioner was not subject to any type of enhanced sentencing.

Next, petitioner argued that his sentence was harsh and excessive because he "had undergone therapy programs and treatment for mental health and behavioral problems." Pet. at 8.  However, these claims are not cognizable on federal habeas review.

"No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted); *see also Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."); *Grimes v. Lempke*, No. 9:10-CV-0068 (GLS/RFT), 2014 WL 1028863, at *3 (N.D.N.Y. Mar. 14, 2014) ("It is well settled that the issue of whether a sentence was overly harsh or

34

excessive is not a proper issue for review in the habeas context unless the sentence was outside of the permissible range provided for by state law.") (citing *White*, 969 F.2d at 1383).

Under New York law, the maximum statutory penalty for the class A-II felony of predatory sexual assault against a child is 25 years to life.  N.Y. PENAL LAW §§ 70.00(2)(a) & (3)(ii), 130.96.  The maximum statutory penalty for the class D felony of first degree sexual abuse is a determinate term of 7 years' imprisonment.  *Id.* §§ 70.02(1)(c) & 3(c), 130.65.  The maximum statutory penalty for the class A misdemeanor of endangering the welfare of a child is a determinate term not to exceed one year of imprisonment.  *Id.* §§ 70.15(1), 260.10.

Here, petitioner was ultimately sentenced to the maximum on each count. Specifically, he received (1) two indeterminate terms of imprisonment from 25 years to life for his two convictions of predatory sexual assault against a child; (2) a determinate 7 year terms of imprisonment for first degree sexual abuse; and (3) a maximum sentence of one year local incarceration for his conviction of endangering the welfare of a child.  S. 20-21; R.S. 2-3. Because the imposed sentences fall within the range proscribed by state law, petitioner's sentencing claims provide no grounds for federal habeas relief.  *See e.g., Rodriguez v. Griffin*, No. 9:16-CV-1037 (DNH), 2018 WL 6505808, at *24 (N.D.N.Y. Dec. 11, 2018) ("[Petitioner]'s . . . sentences . . . even if representing the maximum amount of time permissible . . . fall within the limits set by New York law and therefore petitioner's claim provides no grounds for federal habeas relief.").

## VI.   ADDITIONAL CORRESPONDENCE WITH THE COURT

Petitioner also has an additional fifteen submissions which have been received by the Court, but not otherwise acted upon.  Dkt. Nos. 73-88.  While there are numerous submissions, the content generally falls in to one of three categories.

The majority of these submissions reiterate petitioner's arguments about the merits of his claims which have already been advanced in his Petition and Traverse. Several others revisit the accuracy and credibility of affidavits which were the basis of earlier motion practice to expand the record. Lastly, there is a request to reopen state court proceedings to properly finish exhausting some of the instant claims.

The undersigned has read and considered each piece of additional correspondence that the petitioner has filed and determined that, to the extent the submissions seek any relief, said requests can all be denied as moot. Specifically, the submissions either concern relief which the Court has already considered or the content of the submissions does not otherwise impact or change the instant decision of the Court.

## VII.   CONCLUSION

**WHEREFORE**, it is

**ORDERED** that the petition, Dkt. No. 1, is **DISMISSED AND DENIED**; and it is further

**ORDERED** that petitioner's additional submissions, Dkt. Nos. 73-88, to the extent any are intended to be construed as motions seeking relief similar to or in support of the instant petition are **DENIED AS MOOT**; and it is further

**ORDERED** that the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R. APP. P. 22(b); 2d Cir. R. 22.1.

36

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: March 29, 2024

Glenn T. Suddaby
U.S. District Judge